Good afternoon and may it please the court. I'm Jeff Litwack for the Columbia River Gorge Commission. One of the two appellants in this consolidated matter. I will address how Clark County is implementing federal law. Mr. Bricklin will address the NSF's claim that the National Scenic Area Act does not regulate railroads. We would like to reserve seven minutes collectively for rebuttal. You know that's a little bit optimistic and we'll decide at the time of present. This case involves the application of the STB and this court's interpretation of the ICCTA. In town of Ayer, the STB concluded that the ICCTA does not categorically preempt state and local implementation of federal environmental laws. However, preemption may occur if the state or local implementation is being applied. That's actual, that's not speculative, is being applied in a manner that unreasonably interferes with interstate commerce. The Association of American Railroads, California Department of Tax and Fee Administration, and just last year in Swinomish, this court followed or applied the town of Ayer. No party is arguing that this interpretation of the ICCTA is incorrect. The only issue is the application of that interpretation here. Here, BNSF brought a categorical preemption claim arguing that Clark County is only implementing state law, but Clark County is implementing federal law. It's implementing the Columbia River Gorge National Scenic Area Act. 16 U.S.C. section 544 E.B. Council, as I read the compact, what Congress has done is approved an agreement between Oregon and Washington in which both Washington and Oregon bring their control as states to a joint effort. Congress had provisions that said, whichever is the most restrictive provision, whether it's of Oregon law or Washington law, will be sort of the default provision. Neither Washington nor Oregon brought to this the right to regulate these railroads because of their local zoning ordinances. That clearly would have been preempted. I assume that you will concede that. If you're not, we've got really deep problems and we'd better explore that, but I hope that you're prepared to concede that Clark County doesn't get to have a zoning ordinance and come in and say, no, you have to get approval from the zoning commission before you can change your railroad. Do we have to start with that proposition? Well, Your Honor, this case is governed by the Town of Ayer framework, and the Town of Ayer framework says that local governments and state governments may implement federal environmental laws. When I talk about environmental law, I gave you an example of a zoning law. So does Clark County get to regulate BNSF's changes to its side yard or whatever, the property that it owns and is that preempted by the ICCTA? The answer to that is generally. There are a few exceptions. For example, the Town of Ayer case said that state and local governments can retain certain police powers relating to public health and safety, so building permits and things like that. Generally, you're correct. Generally, they are preempted. So that was the situation before we compact. So neither one of them brings anything here that allows them to do this. Can you explain to me how the Columbia Gorge Act gives them greater powers than they would have had individually? How is the sum greater than the sum of the parts? The Columbia River Gorge National Scenic Area Act, it provides Congress's consent to the states to create this compact. With Congress's consent, the compact becomes federal law itself. And so it does give the states authority to regulate matters that might otherwise be off limits to the states. In this court, in Columbia Gorge United, which was your 1992 decision upholding the constitutionality of the National Scenic Area Act, you stated that virtually all activities in the National Scenic Area affecting the land, the economy, the environment, or the resources have interstate ramifications. So Congress had to give authority to the states to do effective regulation in the National Scenic Area. That's also reflected in the fact that the compact has consent. Only compacts that could in some way impair federal supremacy require consent. And so the fact that there's consent also supports the fact that the National Scenic Area Act has given more authority to the states. Your claim is that the act did give them authority that they would not have had before? Correct, your honor. What provision of the act would that be that would make that clear? Well, it's the entire framework of the act. I would point you directly to section 544D, and that explains how the Gorge Commission and the Secretary of Agriculture are jointly developing a management plan that applies in the National Scenic Area and that the counties must apply through developing National Scenic Area land use ordinances. And that section gives a number of standards for various types of development. But what in, I'm looking at 544DD, the standards for the management plan, and specifically at 5, 6, and 7, which prohibit major development actions, prohibit industrial development, require a certain kind of commercial development. What in there suggests that whatever the states agree to is now federal law and is going to a very, very powerful commission? We have a long history of sort of exempting things that the railroads did. And I'm not sure that the Service Transportation Board, even though it replaces the ICC, lost significant power. I understand, your honor. The authority, it may not be expressed in the National Scenic Area Act, but the Supreme Court has repeatedly, over about 170 years, concluded that when you have an interstate compact with congressional consent, that compact, they call it the Law of the Union Doctrine. And in 1981, the court very clearly said it becomes federal law. And so at that point where it becomes federal law, it actually has given the states the authority to regulate in matters that they would not have otherwise been able to regulate without the consent of Congress. I'm going to reserve the remainder of my time. I want to be respectful for Mr. Bricklin. All right. Thank you, counsel. Mr. Bricklin? Yes, thank you. David Bricklin, representing Friends of the Columbia Gorge. I just, I don't, I want to save time for rebuttal, so I'll be very brief unless the court has questions about this. I was going to address the issue of the, that the Act actually regulates railroads because BNSF has disputed that the Act does that at all. And as we explained in our brief, the structure and the words of the statute make clear that railroads, like all other activities, fall within the ambit of the Act's regulations. The Act did not take the tact of listing each type of activity that might be subject to regulation. They did that in part in the places that Judge Bivey just identified. But preceding those subsections are other subsections that were much more sweeping and made clear that all land uses in the Gorge Scenic Area are subject to the Act's provisions. And what provisions would those be, counsel? So those are sub one through four of that same section. Okay. Protected and enhanced agricultural lands, protected and enhanced forest lands, protected and enhanced. Those are very, very general. Exactly. And, and this... Very general. And so you've just acquired general responsibility. And so you've now, the states that have now taken over that could not have regulated railroads before have now acquired the power to regulate railroads. You, have you got a provision, have you got any case, any place that would support that broad reading of this? Anybody else that's running a compact or running something else, get the permission to regulate the railroads? So in, in this court's decision in Uter, Columbia River Gorge United versus Uter, 1992, you stated under the Act and the resulting compact, all land use within the Columbia River Scenic Area, whether private, federal, or local will be consistent with the management plan adopted by the commission. Yeah. Counsel, that's, I mean, that's a very, very broad, very broad statement. I can see why you'd want to want to, to, to rely on that. But when you have a specific, a very, something very specific about the railroads that is preemptive, all land use, land use doesn't always, doesn't always mean you get to control railroads. Well, land use is often the kind of thing that refers to, for example, zoning, zoning decisions, which would be very consistent with the section that you've just cited me to commercial, residential, industrial are going to be confined to particular, particular areas. True, but land use is not limited to those things. There are all sorts of land use provisions that also relate to where suites and, and rail and other transportation. Is there any other, do you know of any other act that, that would sweep as broadly as you've, as you've claimed this is, or is the Columbia, is the Columbia Act here unique? That is that, that Congress wouldn't allow anybody else to have the power to regulate the railroads, but it did in the Columbia Gorge. You know, I'm not sure that it's accurate to say that Congress allows them to regulate the railroads writ large. It's in a very specific area, not just geographic area, but in the context of protecting the gorgeous values. And yes, there are other statutes. I mean, any number of other statutes in antitrust Sherman act, the environmental statutes, clean water act, safety act, those are all, those are all federal statutes administered by federal entities. Not entirely. This is the state, this is a state compact. I don't see that Congress in fact, Congress denied that it was sort of deputizing Clark County. It was not making Clark County now a federal county. Well, I respectfully disagree that those other statutes don't involve state and local involvement. The clean water and clean air act as examples. Right. In all of those cases, counsel, it is very clear that, uh, that those are provisions in which EPA is effectively adopting the state, um, the state plans as its own. And, and that once it gets an approved plan, the approved plan approved, something approved by EPA becomes as if it were EPA's own plan. Well, first of all, this plan also goes through a federal review process. Second, uh, in the, um, there's other legislation where there's no federal approval involved. There's the, uh, hazardous waste fee act. That was the subject of an, of a ruling by this court, uh, where you determined that if that statute had been properly utilized by the state of California, that it had the authority to impose a fee on railroads. So I, and there's no federal approval involved in those, in those fees. So, uh, it's the, um, your honor is the clock. Is this, uh, this is just of our initials that's not our total 15 running down. Is that right? That's your total 15 running down. So that's our total 15 that I'm going to stop there and reserve the remainder. Thank you. All right. Thank you, counsel. May it please the court, Ginger Anders for VNSF Railway Company. The GORJAC contains no hint that Congress delegated to state and local officials, the sweeping authority to do what no other state can do. And what does Judge Biby noted, no Washington and Oregon couldn't do before the GORJAC, which is veto rail construction in the GORJ. For over a century has been one of the most important rail shipping channels in the country. This court has held that there are two distinct routes by which a federal statute can protect a state or local measure from ICTA's normal preemption. And I think, uh, appellants have conflated them in their briefing and Mr. Bookman has just mentioned them here. So I think it's helpful to untangle them, um, to start because once they're understood as separate doctrines, it's very, very clear that the GORJAC does not satisfy the requirements of either doctrine. So first in AAR versus South coast air quality management district, uh, this court held that if a state promulgated regulation can attain the status of federal law, when it is approved by federal officials and incorporated into federal law, which means that a violation of that rule is then, um, it's constitutes a violation of federal law and it can be enforced by federal court. At that point, the state regulation is harmonized with ICTA to see which one prevails. Then there's a separate doctrine, which is this court's decision in CDTFA. And so there, a federal statute affirmatively authorizes the state to impose a specific regulation that otherwise would be preempted by ICTA. And at that point, the authorizing federal statute, uh, it conflicts with ICTA irreconcilably and the two have to be harmonized to see which one prevails. So taking AAR first, I think it's quite clear that Congress made a concerted effort to avoid federalizing land use regulation in the GORJ. At every turn, the federal government's role is only consultative and, and, um, it involves a provision of assistance. So with respect to the GMA ordinances at issue here, the federal government had no role in promulgating them. The standards pursuant to which they were enacted, the commission had final authority over those. And of course the federal government had no authority whatsoever to enforce or implement those ordinances. And the ordinances are never incorporated into federal law. They remain state law at all times. They can be enforced only as a matter of state law in, in state court. Uh, and as the previous colleague we showed, Congress expressly declined to provide any direct authority to states or counties that act in a couple of places, uh, 544C A1B, for instance, and 544O expressly states that the authority that the commission and the counties use to do this regulation is state law authority. It's authority granted to them by Washington and Oregon. So I think it's quite clear that the GORJ Act does not satisfy the AAR line of cases. So turning to the, the CDTFA line, Congress would have to affirmatively authorize county officials to veto rail construction in the GORJ. So this court would have to conclude that Congress delegated that, that broad authority, um, to veto rail construction in a vital shipping channel. And I think the GORJ Act just falls far short of the affirmative authorization that is necessary to establish that. It is entirely silent with respect to railroads. The standards that we were discussing before in 544D, they do not mention railroads. And I think it's notable that although Congress, uh, did, did enact some more specific standards, including prohibitions for certain uses, it did not say anything with respect to railroads. It's entirely silent with respect to railroads. So there is no federal policy evident on the face of the act in favor of any particular way of regulating railroads. Counsel, is there any way that the, um, GORJ Act can be, um, harmonized with the federal statutes? We don't think that we need to get to harmonization here because there's just no conflict between the GORJ Act and ICTA. Because the GORJ Act does not speak to railroad regulation at all. It does not, it does not affirmatively authorize, as CTFA said, um, uh, counties to veto, uh, rail construction. So, so there's no conflict between the two. They can both be applied. And the other reason I think it's, it's clear that that affirmative authorization isn't here is that it would have been extraordinary for Congress to delegate this kind of authority to, to local officials. For one thing, it would have been clear to Congress when it enacted the GORJ Act that the consequences of a local veto would have been severe. Um, at the time that the act was enacted, uh, railroads had been running through the GORJ for a century. The, and those tracks had established themselves as a, an important shipping link between producers of the Midwest and ports up and down the West Coast. And so Congress would have realized that allowing a county to veto, um, needed improvement projects in the GORJ could create a bottleneck and it could have chain reactions that, that would, that would reverberate, uh, across the Western half of the country. At the same time, since the, since the Transportation Act of 1920, the legal rule had been that, that federal law broadly preempts state and local regulation of railroads. So that, that was the legal baseline against which Congress was, you know, Congress enacted the GORJ Act. And so I think for those two reasons, Congress would have been expressed had it intended to deviate from that settled legal rule in a context in which the consequences of doing so would be so severe. So I don't think there's any way that one can conclude that the, um, that the GORJ Act contains the express authorization necessary to create a conflict with DICTA. At the same time, you know, it's, it's not the case that there are no, no remedies whatsoever, um, within the GORJ. Now, although it is the status quo across the country, that, um, that state and local preclearance requirements are, are, uh, preempted categorically, um, even in the many environmentally sensitive and scenic routes, the rich railroads travel, but, but there are other means of protecting environmental resources. So, you know, federal environmental statutes, for instance, have a role to play here. Uh, for, for this project, for instance, um, BNSF sought and obtained a CWA permit, um, a general permit for construction stormwater discharges. And as part of that permitting process, there was an environmental review that concluded that, um, BNSF's project was not going to have significant impacts. It's not going to impact the nearby wetlands or creeks. Um, and as part of that review, there was also an inadvertent discovery plan. Um, so, so that's one way in which the resources of the GORJ are protected. States also can, uh, DICTA does not preempt generally applicable, um, regulations that aren't an unreasonable burden. And of course, BNSF has a strong incentive to uh, or to voluntarily, uh, collaborate with the localities through which its tracks run. Um, you know, BNSF is a, it's a permanent resident of these communities. It can't just pick up and leave. And so BNSF does endeavor to work with local communities to address local concerns. And that's something that happened here. BNSF offered to, um, to engage with the county, to provide information and to take the measures that Town of Error has said, um, localities can expect railroads to do collaboratively. Um, but the county refused that and insisted that BNSF go through the preference process, which is how we got to this litigation. So, but in many places, BNSF does successfully collaborate with the local communities. And so that is, um, that is an important consideration as well. But at the same time, DICTA provides an important backdrop, um, that ensures that railroads aren't compelled to, um, to undertake preclearance, um, measures that could have, um, a sweeping impact on interstate commerce. And again, I think, you know, even if you had one county in this area able to delay construction, that could have just sweeping ripple effects across the country. And this project was a good example of that. Um, when the improvements were necessary, there were bottlenecks that caused at one point 167 trains to be held up that had chain reactions in the Portland ports, um, that led shippers to have to scramble for more grain. And so I think that really shows how unlikely it is that Congress would have affirmatively delegated this authority to local officials who, after all, are accountable only to the local electorate, um, and don't have any, um, don't have any responsibility to take the national interest, um, into account, which is   Thank you. Thank you. There are no further questions. It appears not. Rebuttal? Mr. Litwack, are you going first? Uh, Your Honor, I'm going to give rebuttal. Um, Your Honor, BNSF says that there must be an affirmative authorization in the National Scenic Area. However, we know that Congress can't list everything that it possibly intends. Uh, we also know that there are new type, new, uh, emerging industries, things like that, that, that come up. Congress mentioned in the act the types of land uses that it intended to save from regulation, water transportation, forest practices, and others. The legislative history shows that the railroads were engaged with the legislation at the time, asked Congress to specifically provide them a savings provision, and Congress did not. We know from your California Department of Tax and Fee Administration case that repeals by implication are disfavored. Congress must specifically address pre-existing law when it wants to suspend normal operations in a later statute. That's from this court. BNSF, over the life of the National Scenic Area, has applied for 12 National Scenic Area approvals. It withdrew four of those applications. It received eight approvals and no denials. BNSF is trying to change the status quo here. For 35 years, we've all known that regulation of railroads was occurring. BNSF said that it had obtained a Clean Water Act permit. It didn't tell you that it obtained that from the Washington Department of Ecology, State Implementation of a Federal Law. We have the same situation here. BNSF also told the No, they did not. They received a State Environmental Policy Act CEPA determination directly from the Department of Ecology. In the application to Ecology and in Ecology's decision, there was mentioned that a National Scenic Area permit was needed. BNSF stated that a National Scenic Area permit was needed. I have one more thought, if I may use it. My time is up, Your Finally, the STB says that preemption may occur if the state or local implementation is being applied in a manner that unreasonably interferes with interstate commerce. We have a backdrop here. We know that if Clark County or any other Gorge County would unreasonably interfere with interstate commerce in a railroad permitting decision, that that would not be permissible. And that is not an interpretation of the ICCTA that the Commission or either of the appellants disagrees with. I see my time is up. Thank you very much for your time on the case. Thank you, counsel. Thank you to all counsel. The case is argued and submitted for decision by the court. That completes our calendar for the day and for the week. We are adjourned. This court for this session stands adjourned.
judges: Rawlinson, Bybee, England